## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JEFFREY CHEEK,**

       **Plaintiff,**

       **v.**

**THE CITY OF EDWARDSVILLE,
KANSAS, et al.,**

       **Defendants.**

_____

**ALVIN DOTY,**

       **Plaintiff,**

       **v.**

**THE CITY OF EDWARDSVILLE,
KANSAS, et al.,**

       **Defendants.**

_____

**MELYNDA HARBOUR,**

       **Plaintiff,**

       **v.**

**THE CITY OF EDWARDSVILLE,
KANSAS, et al.,**

       **Defendants.**

_____

**CONSOLIDATED CASES**

**Case No.  06-2210-JWL**

**Case No.  06-2445-JWL**

**Case No.  06-2459-JWL**

### MEMORANDUM AND ORDER

Plaintiffs Jeffrey Cheek, Alvin Doty, and Melynda Harbour were formerly employed by the police department of the defendant City of Edwardsville, Kansas. These consolidated cases arise from their allegations that the City terminated their employment because they cooperated with an investigation by the Kansas Attorney General's office relating to public corruption among City officials. All three plaintiffs assert claims that the City's termination of their employment violated their First Amendment rights as protected by 42 U.S.C. § 1983. Plaintiffs Cheek and Doty also claim that the City breached their respective employment contracts by failing to pay them severance benefits. And, plaintiff Harbour contends that the City violated her rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654, by wrongfully refusing her FMLA leave and by terminating her employment in retaliation for requesting FMLA leave.

This matter is currently before the court on defendants' motions for summary judgment (doc. #95 in Case No. 06-2210 and doc. #27 in Case No. 06-2445) as to plaintiffs Cheek and Doty's claims. For the reasons explained below, the court will grant defendants' motions for summary judgment as to plaintiffs Cheek and Doty's § 1983 claim on the grounds that they do not have an actionable First Amendment retaliation claim because their asserted protected speech was made pursuant to their official employment duties rather than as citizens. As to plaintiffs Cheek and Doty's breach of contract claims, the court will retain

2

those aspects of the City's motions for summary judgment under advisement pending supplemental briefing by the parties.[1]

Also before the court is plaintiffs' motion to consolidate cases for trial (doc. #103 in Case No. 06-2210).  The magistrate judge previously consolidated the three lawsuits brought by plaintiffs Cheek, Doty, and Harbour for pretrial purposes.   In their current motion to consolidate, they ask the court to continue that consolidation for trial.  In light of the nature of the court's ruling on plaintiffs Cheek and Doty's claims, the court will grant this motion in part and deny it in part.  The court will consolidate plaintiffs Cheek and Doty's lawsuits for trial, but will not consolidate plaintiff Harbour's case for trial.

## STATEMENT OF MATERIAL FACTS[2]

Before plaintiffs Cheek and Doty's employment with the City of Edwardsville was terminated, they both worked as police officers for the Edwardsville Police Department. Plaintiff Cheek had been employed by the police department since October 2002.  Plaintiff Doty had been employed as a police officer for approximately eleven years, and had served

---

[1] The court will issue a separate Memorandum and Order addressing the motion for summary judgment and partial summary judgment in plaintiff Harbour's case.  The court is issuing this order as to plaintiffs Cheek and Doty's claims in order to expedite the time frame for their supplemental briefing.

[2] Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

as a detective since 1997.  In 2004, both were promoted to the then-newly created positions of Major.

At all relevant times, defendant Doug Spangler was the City Administrator. Defendants John Broman, Jennifer Burnett, and Tim Kelly were members of the City Council.  Defendant Lloyd Beth was appointed the Interim Chief of Police on or around May 8, 2006; he is named as a defendant in plaintiffs Doty and Harbour's cases, but not in plaintiff Cheek's case.  Other pertinent individuals from the City who are not named as defendants in these consolidated cases include Stephanie Eickhoff, who was the Mayor of the City at all relevant times; Patrick Isenhour and Robert Lane, who also were members of the City Council; and Steven Vaughan, who was the Chief of Police prior to defendant Beth's appointment as Interim Chief of Police.

Plaintiffs' First Amendment retaliation claim is based on their involvement in an investigation commenced by the Kansas Attorney General's (AG's) office in early 2006 arising from allegations of potentially illegal and improper conduct by Edwardsville employees and officials.  On May 8, 2006, the City terminated plaintiff Cheek's employment by a vote by the City Council.  Council members Broman, Burnett, and Kelly voted in favor of his termination.  On September 25, 2006, the City Council voted to terminate plaintiff Doty's employment.  Council members Broman, Burnett, Kelly, and non-defendant Isenhour voted in favor of his termination.

## I.      Plaintiffs Cheek and Doty's Job Duties

Plaintiff Doty testified in his deposition that, as a detective, his job duties included investigating cases as well as conducting internal affairs (IA) investigations.  He would sometimes seek assistance from outside law enforcement agencies if the City did not have the resources necessary to complete an investigation.  For example, he would ask the Kansas Bureau of Investigation (KBI) to conduct polygraph examinations because the City did not have a trained polygrapher.  He also recalled two occasions when he asked the Federal Bureau of Investigation (FBI) to assist with two large narcotics investigations.

On or about March 5, 2004, Chief Vaughan sent a memorandum to Mr. Spangler concerning the creation of two positions for Majors in the police department.  Attached to the memorandum was a document captioned "Essential Functions of the Majors," which stated in part as follows:

- Reviews personnel related issues and makes recommendation to the Police Chief on actions taken; ensures that departmental and Personnel Policies and Procedures are appropriately carried out; participates in the recruitment and selection process of new officers and promotions.
- Keeps abreast of legal issues, laws, interpretations and developments in the field of law enforcement; develops policies and procedures to ensure that all police activities are conducted in a proper and legal manner.
  . . . .
- Assumes full responsibility for the operation of the department in the absence of the police chief.

On April 14, 2004, Officers Cheek and Doty were promoted to the rank of Major.  As Majors, their job duties also included investigating possible criminal conduct, making arrests, and conducting internal affairs (IA) investigations.  Additionally, they could perform the functions of the Chief of Police in Chief Vaughan's absence.  Even more specifically,

5

plaintiff Doty testified in his deposition that his job duties as a Major included supervising the police department's two detectives, investigating cases himself, and conducting IA investigations.  Plaintiff Cheek testified in his deposition that his job duties as the Major in charge of operations with the police department were to oversee all of the uniformed officers, to make sure there was accountability, "to go over" and "revamp" the department policies, to start having regular staff meetings, to train and mentor the sergeants, and to reestablish a strong chain of command.  He still investigated criminal conduct (from the public) and made arrests from time to time.  Additionally, he also conducted IA investigations of other police officers.

The Standard Operating Procedures of the Edwardsville Police Department state as follows with respect to the handling of IA investigations:

> Complaints alleging improper police conduct, brutality, or misconduct involving several personnel or supervisory personnel, will be handled as an internal affairs matter, and shall be investigated at the direction of the Chief of Police.
>
> a. An internal affairs authority may be appointed at the direction of the Chief of Police.  If there is probable cause to believe an employee has committed a criminal offense, the District Attorney's Office will be notified and an outside agency will be requested to assist and complete an investigation for the proper jurisdiction.  The internal affairs authority will continue and complete the internal investigation.

Plaintiff Doty testified in his deposition that he needed to get the approval from the Chief of Police before conducting an internal affairs investigation of a complaint made against a City police officer.

6

While plaintiffs Cheek and Doty were Majors with the police department, they went to the Federal Bureau of Investigation and requested that the FBI conduct an investigation into allegations of illegal conduct by Edwardsville police officer Sheila Rogoza that were outside the realm of IA, but more in the realm of criminal public corruption.  Officers Cheek and Doty provided information to the FBI regarding the alleged illegal activities of Officer Rogoza, and cooperated with and assisted the FBI in relation to the investigation.  Officer Doty testified in his deposition that he believed it was within the scope of his duties as a major with the Edwardsville police department to seek the FBI's assistance in an ongoing investigation of a subordinate officer when that investigation required resources beyond those available within the department.  In the Rogoza matter, he obtained the approval of Chief Vaughan before enlisting the FBI's help.  Depending on the nature of the case, the Chief of Police would determine whether to seek assistance from another police agency.

Majors Cheek and Doty also conducted an internal affairs investigation regarding Sergeant James Marble for allegedly interfering in the investigation involving Officer Rogoza.  Police Chief Vaughan informed Major Doty that an outside police agency, the Leawood Police Department, would participate in the IA investigation of Sergeant Marble. Mr. Spangler told Major Cheek that the City Council had requested that an outside police agency conduct the investigation.  Officer Marble resigned from the police department when the IA investigation confirmed his actions in compromising an ongoing investigation.

## II.    Potentially Illegal or Improper Conduct by City Employees and Officials

In late 2005 or early 2006, Major Cheek was present when Melynda Harbour, another employee of the police department, discovered a DUI case file in Chief Vaughan's desk. The DUI file had been missing for some time, and had previously been reported as missing. Plaintiff Cheek testified in his deposition that the case file with the original tickets had all the "writings of impropriety on it," and he believed that something improper was going on. He testified as follows with respect to an investigation of Chief Vaughan:

> Q. (By Mr. Denning) So you would agree with me that it would have been unacceptable or inappropriate for you to conduct an investigation of Chief Vaughan?
>
> A. No. I said it would be unacceptable for us to complete the whole investigation. . . . It would be less than proper for us to, on just something hearsay, to go to the Attorney General's office and say, hey, we hear these rumors. . . . If there was enough indication that would come to me to say, hey, your superiors are doing something wrong, while it's a terribly uncomfortable situation, I would have to determine whether there is enough for an investigation to be warranted through some type of initial fact-finding myself to even know if it's worthwhile.
>
> At that point, then I would ask somebody from the outside to do what we don't do, which is public corruption, which is either FBI, KBI or Attorney General, and in this case, Doug Spangler used to brag about knowing people in the KBI. Really wasn't a great option just to go to the KBI and say, hey, one of your friends might be up to something. . . .

Officer Cheek believed that the AG's Office would be the appropriate agency for investigating possible corruption involving Chief Vaughan and the DUI case file.

Mr. Doty testified in his deposition as follows:

> Q [of Mr. Doty]. And so as part of your duties as a police officer that worked for the Edwardsville Police Department for over 10 and a half years if you knew of official misconduct by a superior officer with the Edwardsville Police Department, you would take that information to whatever the appropriate authority might be; correct?
>
> A. I'd report that information, yes.

8

Mr. Doty further testified as follows:

> Q.  When you find or when the DUI case file is found and the citation
> is found in Chief Vaughan's desk, part of your official duties as major with the
> police department of Edwardsville since it involves your superior officer [is]
> to go to an outside law enforcement agency that can investigate that possible
> criminal conduct; correct?
> A.  Yes.
> Q.  And that is what you guys did; correct?
> A.  Yes.

In early January of 2006, Sergeant Hammontree wrote a speeding ticket to Councilman Kelly's brother.  That same day, Councilman Kelly mentioned the ticket to Sergeant Hammontree.  Sergeant Hammontree later checked on the status of the ticket and he could find no record of it with the Edwardsville Municipal Court.  Sergeant Hammontree discussed the circumstances surrounding the ticket with Major Cheek.  The two also discussed the apparent failure to process DUI tickets.  Councilman Kelly spoke to Chief Vaughan about his brother's traffic ticket on two occasions.  The first time, he asked Chief Vaughan how to reduce the speeding ticket to a non-moving violation.  In the second conversation, Chief Vaughan told Councilman Kelly that the ticket had been taken care of or fixed.  Councilman Kelly told Chief Vaughan that was not what he wanted.

In a meeting with Majors Cheek and Doty, among others, Chief Vaughan discussed another incident—Councilman Kelly's effort to influence a cocaine arrest.  Chief Vaughan prepared a memorandum to Mr. Spangler documenting Councilman Kelly's communication with him regarding the cocaine arrest.

Majors Cheek and Doty discussed these various incidents with Sergeant Hammontree, who was also the Vice President of the Edwardsville police union, the Fraternal Order of Police (FOP).  They discussed Councilman Kelly's communications with Chief Vaughan about the cocaine arrest.  Also, Major Cheek showed Sergeant Hammontree a copy of Chief Vaughan's memorandum regarding the cocaine arrest.   Major Cheek also provided information to Sergeant Hammontree that was later incorporated into letters from the FOP to Mayor Eickhoff and the city council members.  Major Cheek and Sergeant Hammontree discussed what outside law enforcement agency would investigate the problems in Edwardsville, including the disappearance of traffic and DUI citations, interference with internal affairs investigations, and interference with arrests.  They discounted the Wyandotte County District Attorney's office because of possible political influence.  Mr. Spangler was a former state legislator from Wyandotte County and had boasted of his connections in the District Attorney's office.  They discounted the FBI and other federal agencies because they were not sure any federal crimes would be involved.  They decided the FOP should go to the Kansas AG's office if it became necessary.

The FOP sent a letter dated January 20, 2006, to Mayor Eickhoff, Mr. Spangler, and the City Council, regarding allegations of potentially illegal or improper conduct by city officials and/or employees.  The Edwardsville FOP sent a letter dated February 11, 2006, to the AG requesting an investigation into allegations of potentially illegal or improper conduct by Edwardsville employees and officials.  John Henre and Terry Hammontree, both officers with the Edwardsville Police Department, were President and Vice President of the FOP,

respectively, when the FOP requested the Kansas AG's investigation in February of 2006. They went to Topeka, Kansas, on February 13, 2006, and requested that the AG's office investigate the allegations of potentially illegal or improper conduct by city officials and/or employees.

In February of 2006, the AG's Office began conducting an investigation into allegations of potentially illegal and improper conduct by Edwardsville employees and officials.  Plaintiff Doty testified in his deposition that any police officer had a duty to cooperate with the AG's office in an investigation by that state agency.

Major Cheek met with a representative from the AG's office, Tom Williams, in late February or early March of 2006 at the Edwardsville police department.  This meeting was not very long.  Plaintiff Cheek met with representatives of the AG's office about "a half dozen times, or somewhere around there" prior to giving inquisition testimony in June of 2006.  He provided information to the AG's office about Councilman Lane having work done on his house for free and also about Councilman Kelly asking Chief Vaughan to influence a cocaine charge, and he told the AG's investigators that he had been informed that Councilman Kelly had Chief Vaughan dispose of a speeding ticket issued to his brother.  He also communicated with representatives of the AG's office by telephone.  He provided information to the AG's office (prior to his termination) about the missing DUI case.

In March of 2006, Major Doty provided information to the Attorney General's investigators to the effect that Councilman Kelly had contacted Chief Vaughan in an effort to influence the handling of an arrest of a friend of his on charges of possession of cocaine.

He also provided information to the AG's investigators to the effect that Councilman Lane had remodeling done on his basement for free as a result of his position with the City. Plaintiff Doty met with representatives from the AG's office at least five times. He told the representatives that Chief Vaughan and Mr. Spangler said that the City Council had ordered a halt to the IA investigations of Officers Rogoza and Marble, that he had been told that Councilman Lane had remodeling done on the basement of his home for free through a company contracting with the City, and that Chief Vaughan had prepared a memorandum stating that Councilman Kelly had attempted to influence the handling of a cocaine arrest.

In a special City Council meeting in February of 2006, Mayor Eickhoff recalled a discussion about the fact that Majors Cheek and Doty had provided information to the AG's office. Councilmen Lane and Kelly focused on Majors Cheek and Doty. In an executive session of the City Council, Mr. Spangler told the council members that Major Cheek was encouraging the FOP and "he needs to go." Councilman Isenhour understood Mr. Spangler's statement to mean that he wanted Major Cheek fired as soon as possible.

On April 3, 2006, Mr. Spangler issued a memorandum suspending Major Cheek. On May 8, 2006, plaintiff Cheek had a grievance hearing before the City Council, and he was terminated at the City Council meeting that same day. At that hearing, plaintiff Cheek, through his legal representative, told the Council that he was being terminated in retaliation for his participation in the AG's investigation. Council members Broman, Burnett, and Kelly voted to terminate Major Cheek's employment. The reasons they gave for supporting his termination included an allegedly racial comment that he made to a horse thief suspect on

12

February 27, 2006, a civil lawsuit filed against him in Wyandotte County District Court, a heated conversation between Mr. Spangler and him, and changes that were made to his and Mr. Doty's employment contracts.  Additionally, Councilwoman Burnett believed that plaintiff Cheek had a violent nature, and Councilman Kelly did not feel safe in the presence of plaintiff Cheek.

On July 28, 2006, the AG's office filed criminal charges against Chief Vaughan and Councilman Lane in relation to their alleged hindering of the DUI prosecution.

On September 25, 2006, the City Council voted to terminate plaintiff Doty.  The reasons given for his termination were his alleged failure to follow orders including returning keys for his patrol car, patrolling certain areas of Edwardsville, and certain identified citizen complaints.

## II.  Facts Relating to Breach of Contract Claim

Plaintiffs Cheek and Doty were promoted to the position of Major on April 14, 2004. Prior to their promotions, their employment had been covered by a memorandum of understanding with the FOP.  Once they were promoted to the rank of Major, their employment was no longer governed by that memorandum and, consequently, at that point neither of them had a written employment contract with the City.  On March 28, 2005, the City Council voted on and approved employment contracts for them.  The minutes of the City Council meeting show that the council approved the employment agreements attached to the minutes "with revisions."  At the meeting, the City Council directed that the contracts for Majors Cheek and Doty "shadow" Chief Vaughan's contract.

13

Mayor Eickhoff signed the contracts, in revised form, on June 23, 2005.  These contracts differed in essentially two material respects from the form contracts which were originally approved by the City Council.  Those two provisions at issue state as follows:

> **7.**     **TERM OF EMPLOYMENT**.  Subject to the city council's right of removal, which is absolute, Employee will be employed in the capacity of Major permanently until such time that the Employee is promoted or the City exercises their [sic] right to cause the Employee's removal[,] or the Employee voluntarily separates from their [sic] employment.  If the City causes the Employee's removal, the Employee will be entitled to severance pay in accordance with the terms of this agreement. . . . . . . .
>
> **10.**    **SEVERANCE.**  If the City terminates or abolishes the Employees [sic] position with or without cause, . . . Employee will be entitled to a severance package of an additional two years of their [sic] current annual salary and accrued benefits that the employee would otherwise have earned had they [sic] been actively employed.
>
> For purposes of this agreement, "termination for cause" will mean a termination for any of the reasons referred to in the City's personnel policies as justifying termination "for cause". [sic] Whether a termination [is] "for cause" will be determined initially by the city administrator, who will give written notice of that determination to the Employee. The city administrator's determination will be subject to the City's grievance procedures then in effect for all employees.  The amount of the severance will be a cash payment and the Employee may elect to receive the severance in three equal installments.

Additionally, the summary judgment record reflects that those contracts contained an additional provision entitled "TERMINATION," which stated as follows: "Nothing in this agreement may be read to prevent, limit or interfere with the City's absolute right to terminate or remove the employee at any time."

14

Plaintiffs Cheek and Doty assert breach of contract claims based on the City's refusal to pay them severance pay. They contend that they are entitled to severance benefits because the City Council terminated them involuntarily.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack

of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

For the reasons explained below, the court finds that plaintiffs Cheek and Doty have not met their summary judgment burden of providing evidence that their speech was made

in their capacity as citizens rather than pursuant to their official employment duties as law enforcement officers and Majors with the Edwardsville police departments. Consequently, they cannot withstand summary judgment on their § 1983 First Amendment retaliation claim. As to plaintiffs Cheek and Doty's breach of contract claims, the court rejects the specific arguments put forth by the City that Mayor Eickhoff did not have authority to enter into the employment contracts, but the parties have not addressed the potential ramifications of the controlling statutory provision as to its impact on her authority to bind the City to the severance provisions at issue. Consequently, the court will retain those aspects of defendants' motions under advisement pending supplemental briefing by the parties.

## I.      § 1983 Claim for Violation of First Amendment Rights

The Supreme Court's landmark decision in *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), "profoundly alters how courts view First Amendment retaliation claims." *Casey v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1325 (10th Cir. 2007). After *Garcetti*, the court's analysis of freedom of speech retaliation claims is governed by a five-step inquiry referred to as the *Garcetti/Pickering* analysis. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, — F.3d —, 2007 WL 2007546, at *5 (10th Cir. July 12, 2007) (publication forthcoming). First, the court must determine whether the plaintiff was speaking "as a citizen" or "pursuant to [his or her] official duties." *Id.* (quoting *Garcetti*, 126 S. Ct. at 1960). "If the employee speaks pursuant to his or her official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" *Id.* (same).

Second, if the employee does not speak pursuant to his or her official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern.  *Id.*  If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends.  *Id.*  Third, if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Id.* (quotation omitted).  Fourth, if the employee's interest outweighs that of the employer, the employee must show that his or her speech was a "substantial factor or a motivating factor in [a] detrimental employment decision." *Id.* (quotation omitted).  Finally, if the employee establishes that his or her speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Id.* (quotation omitted). The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact. *Id.*

Defendants contend that they are entitled to summary judgment based on the first stage of this analysis—that is, that the alleged speech was part of plaintiff Cheek and Doty's official duties as police officers and Majors with the Edwardsville police department.  In *Garcetti*, the Supreme Court declined to articulate a comprehensive framework for determining when a government employee speaks pursuant to his or her official duties.  126 S. Ct. at 1961.  The Tenth Circuit, however, has provided significant guidance on this issue since *Garcetti*.  Speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation. *Brammer-Hoelter*, 2007 WL 2007546, at

18

*6.  This may be true even though the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions.  *Id.*  Thus, speech is made pursuant to official duties if it is generally consistent with "the type of activities [the employee] was paid to do. *Id.* (quotation omitted).  An employee's official job description is not dispositive.  *Id.* at *6. "The ultimate question is whether the employee speaks as a citizen or instead as a government employee–an individual acting 'in his or her professional capacity.'"  *Id.* (quoting *Garcetti*, 126 S. Ct. at 1960).  Consequently, if an employee engaged in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties.  *Id.*  At the same time, not all speech that occurs at work is made pursuant to an employee's official duties.  *Id.*  Nor is all speech about the subject matter of an employee's work necessarily made pursuant to the employee's official duties. *Id.*  Instead, the court "must take a practical view of all the facts and circumstances surrounding the speech and the employment relationship."  *Id.*  On a motion for summary judgment where the defendant has asserted the defense of qualified immunity (as is the case here), the plaintiff bears the burden of providing evidence that his or her statements were made in his or her capacity as a citizen, and not as part of his or her official duties.  *Casey*, 473 F.3d at 1328.

In this case, plaintiffs have not met their burden of providing evidence that their statements were made in their capacity as citizens rather than as part of their official job duties.  The court must take a practical view of the employment relationship and focus on the

duties plaintiffs Cheek and Doty were expected to perform. *Garcetti*, 126 S. Ct. at 1962. As law enforcement officers and Majors with the police department, it is undisputed that they were responsible for investigating criminal conduct and conducting IA investigations. Thus, regardless of whether they were reporting alleged misconduct by fellow law enforcement officers such as Chief Vaughan (in which case their speech would have involved an internal affairs matter) or the misconduct of other City employees and officers (in which case it would have involved a criminal matter), in either event their speech owed its existence to activities that the City paid plaintiffs Cheek and Doty to do. This included their communications with Sergeant Hammontree. Even though Sergeant Hammontree was a representative of the FOP, he was also a fellow law enforcement officer. And, the summary judgment record reflects that their discussions with Sergeant Hammontree were geared toward determining how best to handle the alleged improprieties from a professional standpoint. Their numerous instances of speech with the AG's investigators were also attributable to their professional duties, as plaintiff Doty specifically testified that they had a duty to cooperate with the AG's investigation. The court cannot envision any view of the facts in which these instances of speech would not be considered to have reasonably contributed to or facilitated their performance of their duties to investigate criminal conduct and conduct IA investigations. Even though their speech involved an unusual predicament that was not part of their everyday functions, it was "generally consistent with the type of activities [they] were paid to do." *Brammer-Hoelter*, 2007 WL 2007546, at *5 (quotation omitted) (noting that speech within an employee's uncontested employment responsibilities

is not protected even though it might concern an unusual aspect of an employee's job that is not part of his or her everyday functions).

The court rejects plaintiffs' argument that their speech should be entitled to protection solely because it was made to an outside agency. In support of this argument, they rely on case law including *Lindsey v. City of Orrick*, — F.3d —, 2007 WL 1814943, at *3 (8th Cir. 2007) (publication forthcoming) (statements made by municipal public works officer to city council concerning violations of sunshine law compliance were made as a citizen), and *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 1918 (2007) (female correction officer's speech to state senator and to inspector general's office regarding unremedied sexual harassment was made as a citizen). The court finds no support in those cases, however, for any such per se rule that statements made to outside agencies necessarily constitute statements made as citizens rather than pursuant to official employment duties. Instead, the courts' holdings in those cases are attributable to the scope of the plaintiffs' job responsibilities in those cases. In contrast, in this case the summary judgment record establishes that the Edwardsville police department routinely sought assistance from outside agencies in appropriate circumstances. The department had the FBI conduct an investigation concerning Officer Rogoza, and plaintiffs Cheek and Doty provided information to, cooperated with, and assisted the FBI in connection with that investigation. The department also enlisted the assistance of the Leawood Police Department in connection with the IA investigation of Sergeant Marble. The deposition testimony of both plaintiffs Cheek and Doty establishes that the matter concerning Chief Vaughan's retention of the DUI case file

21

was a matter to be dealt with by an outside agency.  The determination of which agency to refer the various matters, and how to accomplish that referral, was an exercise of their professional judgment.  Additionally, their subsequent discussions with the AG's investigators fell within the scope of their employment duties, as established by plaintiff Doty's testimony that any police officer had a duty to cooperate with the AG's office in an investigation by that agency.  Thus, this is simply not a case where they can be deemed to have spoken as citizens, rather than pursuant to their official duties, simply because their speech was made to outside agencies.

Plaintiffs also rely on the Edwardsville Police Department's Standard Operating Procedures concerning the handling of IA matters.  Those procedures vest authority for such internal affairs matters in the Chief of Police and require that the Wyandotte County District Attorney's Office be notified to complete the investigation.  In *Garcetti*, however, the Supreme Court specifically rejected any isolated reliance on those types of formal documents in determining the scope of an employee's job duties.  The Court noted that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."  126 S. Ct. at 1961-62.  So, too, an employee cannot rely on formal standardized policies and procedures which may bear little resemblance to the actual workings of the workplace.  That is particularly so where, as here, the policy relied upon by the plaintiff employee does not really address the situation

22

with which the employee was confronted.  In this case, plaintiffs Cheek and Doty were confronted with a situation of alleged misconduct by their superiors, Chief Vaughan in particular, where it would have made little sense to follow the procedure requiring him to direct the IA investigation.  Similarly, they were reporting alleged misconduct of another superior, City Administrator Spangler, for whom they perceived that it would have been futile to report his alleged misconduct to the DA's office given his purported connections.  Consequently, this operating procedure cannot plausibly be deemed to divest them of the responsibility to report such misconduct.

In sum, the court finds as a matter of law that plaintiff Cheek and Doty's speech was made pursuant to their official duties rather than as citizens, and therefore that speech is not entitled to protection under *Garcetti*.  *See Morales v. Jones*, — F.3d —, 2007 WL 2033754, at *5-*6 (7th Cir. July 17, 2007) (publication forthcoming) (one officer's speech to another officer regarding alleged misconduct by police chief and deputy chief was made pursuant to the speaking officer's official duties and thus was unprotected under *Garcetti*; another officer's speech to assistant district attorney about the same alleged misconduct by the police chief and deputy chief was also made pursuant to that officer's official duties); *Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007) (police detective's report to his supervisors that he believed members of his task force broke the law by tipping off suspects regarding arrest warrants and jeopardized the success of the operation was speech made pursuant to official duties); *Williams v. Riley*, 481 F. Supp. 2d 582, 584 (N.D. Miss. 2007) (county police officers did not speak as citizens when they submitted a written report which detailed the

beating of a restrained prisoner by a fellow officer).  Accordingly, defendants' motions for summary judgment on plaintiffs Cheek and Doty's § 1983 First Amendment retaliation claim is granted.

## II.     Breach of Contract Claim

The City contends that it is entitled to summary judgment on plaintiffs Cheek and Doty's breach of contract claims on the grounds that their contracts are unenforceable.  The City's reasoning in this respect is that plaintiffs Cheek and Doty's claims are not based on the form contracts approved by the Edwardsville City Council on March 28, 2005, but rather are impermissibly premised on revised versions of the contracts which were executed by Mayor Eickhoff on June 23, 2005.  The City contends that the revised contracts contained different terms (their severance provisions, in particular) than the contracts voted on and approved by the City Council, and that Mayor Eickhoff lacked the authority to agree to those terms.

"Generally, a contract entered into by a governmental agent is binding on the governmental entity." *Templeton v. Kan. Parole Bd.*, 27 Kan. App. 2d 471, 473, 6 P.3d 910, 913 (2000).  A municipal corporation cannot bind itself by any contract which is beyond the scope of its powers. *Weil & Assocs. v. Urban Renewal Agency*, 206 Kan. 405, 416, 479 P.2d 875, 885 (1971).  Persons contracting with a municipal corporation are obligated to inquire into the agency's power and be aware of the limits of its powers.  *Blevins v. Bd. of Douglas County Comm'rs*, 251 Kan. 374, 384, 834 P.2d 1344, 1352 (1992).  Thus, the binding nature of governmental contracts is limited by the agency's statutory authority. *Templeton*, 27 Kan.

24

App. 2d at 473, 6 P.3d at 913.  An attempt by a governmental agency to enter into a contract in violation of its authority will be considered void.  *Wiggins v. Housing Auth.*, 22 Kan. App. 2d 367, 370, 916 P.2d 718, 721 (1996).  If a municipal corporation enters into a contract it has no power to make, the contract is ultra vires and unenforceable.  *Id.*  "[A]ny reasonable doubt as to the existence of a particular power must be resolved against its existence."  *Id.* (citing *Wichita Pub. Sch. Employees Union v. Smith*, 194 Kan. 2, 4, 397 P.2d at 357, 359 (1964)).

The City pursues its theory that the Mayor lacked authority to bind the City to the revised contracts from essentially three different angles.  First, the City argues that there was no "meeting of the minds" as to the employment contracts because the versions that were finally signed on June 23, 2005, contained terms that were significantly and materially different from the terms voted on and approved by the City Council.  It is true that in order for parties to form a binding contract, there must be a "meeting of the minds" as to all of its essential terms.  *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 488, 15 P.3d 338, 352 (2000).  The City's argument premised on the asserted lack of a "meeting of the minds," however, assumes that the mayor was without authority to manifest assent to the contract on behalf of the City.  Thus, the City's "meeting of the minds" argument is really a roundabout way of saying that Mayor Eickhoff did not have authority to bind the City to the contract.

Consequently, the court proceeds to the City's second argument, in which the City contends that the mayor lacks express statutory authority to enter into employment contracts that are not approved by the City Council.  Certainly, the City has the statutory power to

enter into contracts.  K.S.A. § 12-101.  And, the governing body includes the mayor and the city council.  *Id.* § 12-104.  It is undisputed that Edwardsville is a city of the third class.  As such, the general powers and duties of the mayor are set forth in K.S.A. § 15-301, which states that the mayor has "general supervision over the affairs of the city."  Additionally, the Edwardsville local ordinances give the mayor "superintending control of all officers and affairs of the city."  Edwardsville Local Ordinance § 1-205.  The City contends that the lack of express statutory authority for the mayor to enter into an employment contract suggests that Mayor Eickhoff lacked the authority to do so in the absence of approval from the City Council.  The court disagrees because the cited statute and ordinance give the mayor general supervision and superintending control over the officers and affairs of the City.  The power to enter into contracts, such as the employment contracts at issue here, unless that power is limited by statute or otherwise, is necessary to make those express powers effective.  *See Jordan v. City of Overland Park*, 215 Kan. 700, 709, 527 P.2d 1340, 1348 (1974) (cities have the powers expressly granted by law and those necessary to make those powers effective); *cf. Piper v. City of Wichita*, 174 Kan. 590, 597, 258 P.2d 253, 598 (1953) (statute making city manager, in city manager form of government, responsible for administration of the city's affairs included responsibility for personnel matters).

In an attempt to determine the relative power to contract as between the City Council vis a vis the Mayor, the City points out that in cities of the third class, the appointment of law enforcement officers is governed by K.S.A. § 15-204.  That statute governs the appointment of city officers in general, including law enforcement officers, and it states that the mayor

is vested with authority to "appoint" officers "with the consent of the council." K.S.A. § 15-204. The City contends that this statute suggests that any employment contract entered into on behalf of the City must be approved by the City Council. Although the court agrees that this statute is of critical importance in determining the enforceability of the particular provision on which plaintiffs' claims depend, the court disagrees with this specific argument by the City. The portion of the statute which requires the City Council's consent addresses only the power to "appoint" city officers. To "appoint" means to "designate, choose, select, assign, ordain, prescribe, constitute, or nominate." Black's Law Dictionary 99 (6th ed. 1990); *see also* Black's Law Dictionary 109 (8th ed. 2004) (appointment means "[t]he designation of a person, such as a nonelected public official, for a job or duty"). The language of the statute, then, gives the city council the power to consent to the mayor's designation or selection of particular city officers, but nothing more. The City does not argue that the City Council did not consent to designating plaintiffs Cheek and Doty as Majors in the police department, and the statute did not require the City Council to consent to the subsequent employment contracts.

The final argument advanced by the City in support of its theory that the employment contracts are unenforceable is that the provisions purporting to employ plaintiffs Cheek and Doty as Majors "permanently" and providing that plaintiffs are entitled to a two-year severance package impermissibly attempt to limit the City Council's statutory rights and are in direct conflict with § 15-204. The court turns first to the so-called "permanent" term of employment. This term does not have the meaning ascribed to it by defendants. Kansas

courts follow the general rule that "in the absence of an express or implied contract of duration . . . , employment is terminable at the will of either party." *Burnett v. Southwestern Bell Tel., L.P.*, 283 Kan. 134, 146, 151 P.3d 837, 845 (2007) (quotation omitted).  The use of the term "permanent" in an employment contract does not mean employment for a fixed or definite period of time, but rather that the job is of some permanence as distinguished from being temporary. *Johnson v. Nat'l Beef Packing Co.*, 220 Kan. 52, 54-55, 551, P.2d 779, 782 (1976); *Wiggins*, 22 Kan. App. 2d at 370-71, 916 P.2d at 721.  Moreover, plaintiffs Cheek and Doty's employment contracts expressly preserved the City Council's statutory right of termination. *See* K.S.A. § 15-204 ("Any officer may be removed by a majority vote of the total membership elected or appointed to the council . . . .").  The contracts stated that the so-called "permanent" term of employment was "[s]ubject to the city council's right of removal, which is absolute."  And, a separate provision stated that "[n]othing in this agreement may be read to prevent, limit or interfere with the City's absolute right to terminate or remove the employee at any time."  Consequently, the City Council's termination of plaintiffs Cheek and Doty's employment did not constitute a breach of the employment contract.

An entirely separate issue arises, however, as to whether the severance provisions are actually enforceable.  Although the mayor has general supervisory and superintending authority over the City's officers, which necessarily implies the ability to enter into employment contracts, that does not mean that all provisions set forth in employment contracts are enforceable.  To that end, the parties have not discussed the mayor's authority to contract for severance pay in light of a statutory provision which, in the court's view,

might very well be at the heart of their dispute.  K.S.A. § 15-204 not only governs the mayor's appointment of officers, it also governs those officers' "duties and compensation." It states that "[t]he duties and pay of the various officers shall be regulated by ordinance." The court believes that defendants' motions for summary judgment raise the issue of the potential impact of this statutory provision because the City argues that Mayor Eickhoff acted beyond her authority under § 15-204.  But, because the City did not specifically address the "regulated by ordinance" provision in § 15-204 as a basis for its summary judgment motion, plaintiffs have not had an opportunity to address the possible ramifications of this particular statutory provision.

As such, the court will retain under advisement the City's motions for summary judgment as to plaintiffs Cheek and Doty's breach of contract claims, and the court will direct the parties to submit supplemental summary judgment briefs limited to addressing this issue.  The City may submit a supplemental brief in support of its motions for summary judgment on or before **September 5, 2007**, plaintiffs shall file a supplemental response on or before **September 14, 2007**, and the City may file a supplemental reply on or before **September 21, 2007**.

## MOTION TO CONSOLIDATE CASES FOR TRIAL

The magistrate judge consolidated the lawsuits of plaintiffs Cheek and Doty as well as another lawsuit filed by Melynda Harbour for all pretrial purposes.  Plaintiffs have since filed a motion to consolidate all three cases for trial.  Rule 42(a) of the Federal Rules of Civil

29

Procedure allows a court to consolidate "any or all of the matters in issue in the actions" if the actions involve "common questions or law or fact."  Fed. R. Civ. P. 42(a).   In view of the nature of the court's ruling on plaintiffs Cheek and Doty's First Amendment claims, the court will grant plaintiffs' motion to consolidate as to plaintiffs Cheek and Doty's cases to the extent that any claims ultimately survive for trial, but will deny the motion as to plaintiff Harbour's case.  As explained herein, plaintiffs Cheek and Doty's cases continue to share common questions of law or fact relating to the severance provisions in their employment contracts.  Because those cases no longer contain § 1983 First Amendment retaliation claims, however, the court finds that continued consolidation with plaintiff Harbour's case is no longer warranted.  Judicial efficiency would best be served by addressing plaintiffs Cheek and Doty's remaining breach of contract claims in a context separate and apart from plaintiff Harbour's § 1983 First Amendment retaliation and FMLA claims.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motions for summary judgment (doc. #95 in Case No. 06-2210 and doc. #27 in Case No. 06-2445) are granted as to plaintiffs Cheek and Doty's § 1983 First Amendment retaliation claims.  Those motions are taken under advisement, pending further briefing, as to plaintiffs' breach of contract claims.  The City is directed to submit a limited supplemental brief in support of its motions for summary judgment on or before **September 5, 2007**, plaintiffs shall file a

supplemental response on or before **September 14, 2007**, and the City may file a supplemental reply on or before **September 21, 2007**.[3]

IT IS FURTHER ORDERED that plaintiffs' motion to consolidate cases for trial (doc. #103 in Case No. 06-2210) is granted in part and denied in part. The lawsuits brought by plaintiffs Cheek and Doty (Case Nos. 06-2210 and 06-2445) remain consolidated for trial, but those cases are not consolidated for trial with the lawsuit brought by plaintiff Harbour (Case No. 06-2459).

IT IS SO ORDERED this 24th day of August, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[3] As a result of the court's rulings in this Memorandum and Order, plaintiffs Cheek and Doty's claims which may survive are hereby set for trial on **October 30, 2007**.