## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JEFFREY CHEEK,**

        **Plaintiff,**

        **v.**

**THE CITY OF EDWARDSVILLE,
KANSAS, et al.,**

        **Defendants.**

_____

**ALVIN DOTY,**

        **Plaintiff,**

        **v.**

**THE CITY OF EDWARDSVILLE,
KANSAS, et al.,**

        **Defendants.**

_____

**MELYNDA HARBOUR,**

        **Plaintiff,**

        **v.**

**THE CITY OF EDWARDSVILLE,
KANSAS, et al.,**

        **Defendants.**

_____

**<u>CONSOLIDATED CASES</u>**

**Case No.  06-2210-JWL**

**Case No.  06-2445-JWL**

**Case No.  06-2459-JWL**

## MEMORANDUM AND ORDER

Plaintiffs Jeffrey Cheek, Alvin Doty, and Melynda Harbour were formerly employed by the police department of the defendant City of Edwardsville, Kansas. These consolidated cases arise from their allegations that the City terminated their employment because they cooperated with an investigation by the Kansas Attorney General's office relating to public corruption among City officials. The court previously addressed defendants' motions for summary judgment as to plaintiffs Cheek and Doty's claims. *See Cheek v. City of Edwardsville*, — F. Supp. 2d —, 2007 WL 2417011, at *1-*16 (D. Kan. Aug. 24, 2007) (publication forthcoming). This matter is currently before the court on defendants' motions for summary judgment as to plaintiff Harbour's claims (docs. #15 & #47 in Case No. 06-2459). Plaintiff Harbour asserts claims that the City's termination of her employment violated her First Amendment rights as protected by 42 U.S.C. § 1983 and that the City violated her rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654, by wrongfully refusing her FMLA leave and by terminating her employment in retaliation for requesting FMLA leave. For the reasons explained below, the court will deny defendants' motions for summary judgment on plaintiff Harbour's claims.

2

## STATEMENT OF MATERIAL FACTS[1]

Plaintiff Melynda Harbour was employed as a civilian employee in the Edwardsville Police Department for approximately six years.  Her position was primarily administrative and clerical, in that she effectively functioned as the office manager.  In early 2006, she found a complete DUI file in the desk of then-Chief of Police Steve Vaughan while she was trying to locate unrelated paperwork in his absence.  She considered it very unusual for Chief Vaughan to have a complete file in his desk.  The original citations should have gone to the municipal court clerk and the driver's license should have gone to the Department of Revenue.  She gave the file to Sergeant Terry Hammontree because he prepared statistics on DUI cases and had been looking for the file.

After a series of incidents revealing other possible misconduct by city employees and officials, in February of 2006 the Kansas Attorney General's (AG's) office initiated an investigation at the behest of the Edwardsville Fraternal Order of Police (FOP).  Plaintiff met with Tom Williams, an investigator for the AG's office, on several occasions.  She met with Mr. Williams at city hall during regular business hours and, on more than one occasion, defendant Doug Spangler, the City Administrator, saw Mr. Williams interviewing her.  She told Mr. Williams about finding a complete DUI case file in Chief Vaughan's desk, that it was odd for Chief Vaughan to have a file with an original citation and related paperwork on

---

[1] Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

his desk, that Chief Vaughan had come to her the morning after the DUI citation had been written and asked for the file, and that she had given Chief Vaughan the file even though she had considered his request unusual.

On March 28, 2006, plaintiff testified at the AG's office in Topeka, Kansas, in response to an inquisition subpoena.  Just before she was to testify, she met with Mr. Spangler.  He asked plaintiff what she had specifically told the investigators, and told her "not to burn [Vaughan] at the stake" in her testimony.  She declined to tell Mr. Spangler what she said to the investigators and told him that she intended to tell the truth in her testimony.  Under oath during her inquisition testimony, she repeated what she had told Mr. Williams about Chief Vaughan taking the DUI citation from her the morning after it had been written.  She also testified that she had asked Chief Vaughan that morning if he intended to "fix" the ticket, that she had asked Chief Vaughan that morning if Mr. Spangler wanted him to fix the ticket, and that Chief Vaughan had indicated to her nonverbally that she was correct – either by shrugging or by pointing toward Mr. Spangler's office.

Jeffrey Cheek and Alvin Doty, also plaintiffs in these consolidated cases, were police officers and Majors with the Edwardsville Police Department.  As explained in the court's prior Memorandum and Order, they also were involved with the AG's investigation into possible misconduct by Edwardsville employees and officials, including Chief Vaughan and members of the Edwardsville City Council.  The summary judgment record reflects that the City Council was generally aware of plaintiffs Cheek and Doty's involvement in the investigation, and that Mr. Spangler told the City Council that Major Cheek "needs to go."

4

City Councilman Patrick Isenhour heard the comment and understood it to mean that Mr. Spangler believed that Major Cheek should be fired immediately.  The members of the City Council who are named as defendants in this lawsuit and Mr. Spangler made various derogatory comments about the AG's investigation to the effect that they believed they were being set up, targeted, and that the allegations were "bullshit."  They were aware that plaintiff had received an inquisition subpoena from the AG's office.

The summary judgment record contains evidence which, viewed in the light most favorable to plaintiff, establishes that a special City Council meeting was called on March 31, 2006, for the purpose of terminating Major Cheek's employment based on suspect justifications which were in fact a coverup for terminating him in retaliation for his cooperation in the AG's investigation.  That day, Major Cheek and Mr. Spangler had a heated discussion and the City Council meeting did not take place, perhaps due to the lack of a quorum.  On April 3, 2006, Mr. Spangler suspended Major Cheek.  Major Cheek's employment was terminated by a majority vote of the City Council on May 8, 2006.

Also on May 8, 2006, defendant Lloyd Beth was appointed Interim Chief of Police. Shortly after he became Interim Chief, he and Mr. Spangler met with Major Doty and Ms. Harbour.  During the meeting, Major Doty and Ms. Harbour were told they needed to join the "new organization."   Mr. Spangler raised his voice and yelled about the AG's investigation.  No similar meetings were held with any other employees of the police department.

5

James Marble had formerly been a Sergeant with the Edwardsville Police Department. He had resigned when an internal affairs (IA) investigation confirmed that he had compromised an ongoing investigation by providing confidential information to a civilian. After defendant Beth was appointed Interim Chief, Mr. Spangler suggested rehiring Mr. Marble as a Major because Chief Beth claimed to need administrative help.  After Mr. Marble returned as Major, he asked plaintiff about copies of the IA investigation files pertaining to him, and he then began shredding documents in his office.  Also after he returned as a Major, he and Chief Beth went into the police department computer system. Plaintiff had continued to communicate with Mr. Williams, the AG's investigator, through emails she sent from her office at the police department.  Chief Beth obtained at least three emails plaintiff sent to Mr. Williams in late June of 2006.

On or about July 17, 2006, plaintiff's position was cut from full time to part time.  As a result of the reduction, she lost benefits, including health insurance.  Around this same time, Major Doty received a two-week suspension without pay, and the legitimacy of the reasons for that suspension are disputed.  On July 28, 2006, the AG filed charges against former Chief Vaughan and Councilman Lane relating to hindering DUI charges.  When Major Doty returned to work on July 31, 2006, Chief Beth immediately suspended him again without pay, again for questionable reasons.

On or about August 2, 2006, plaintiff submitted to the City a note from her physician, Dr. Weatherford, requesting two to four weeks leave from work due to stress.  The note stated as follows: "I believe Ms. Harbour needs 2-4 weeks off work due to job related stress

6

in addition to other stresses including concern over family members [sic] health."  Plaintiff testified that she believed that, based on Dr. Weatherford's request, she needed to return to work around August 23 or 24, 2006.  On or about August 23, 2006, she contacted Phyllis Freeman, another City employee, and requested a copy of the City's FMLA leave form.  She told Ms. Freeman that her father was having open heart surgery at St. Luke's Hospital.  He had open heart surgery on or about August 23, 2006.

On or about August 25, 2006, plaintiff's daughter, Brittany Harbour, was involved in a car accident.  Immediately following the accident, she was treated at the Overland Park Regional Medical Center.  The emergency room physician gave her prescriptions for a muscle relaxant and pain medication.  She saw Dr. Weatherford on August 30, and he referred her to Lawrence Memorial Hospital for a CT scan the same day because she had a "persistent . . . headache" following a "closed head injury."

Plaintiff did not immediately notify Chief Beth that she needed additional leave and she did not contact Chief Beth about returning to work.  She was never told by a medical provider that it was necessary that she provide care to her father as a result of his heart surgery or to her daughter as a result of the car accident.  The City's personnel manual provides that an employee that is absent for more than three days or fails to timely return from unpaid leave is considered to have resigned.  On September 5, 2006, Chief Beth sent plaintiff a letter which stated as follows:

> The note from your Doctor said you needed between 2 to 4 weeks off work.  According to the statement you should have been back to work August 30, 2006.  I understand your Dad has been ill and I'm sorry to hear that and

understand how stressful that can be, but we need to hear from you by September 12, 2006 as to when you can return to work.  If we do not hear from you by September 12, 2006, we will assume you have voluntarily quit.

On September 11, 2006, plaintiff sent Chief Beth a response letter.  She stated that she had "no intention of leaving [her] job with the City of Edwardsville."  She explained that she had remained off work because her father recently had heart surgery and her daughter had been involved in a serious car accident.  She informed Chief Beth that she had "recently contacted Phyllis Freeman to obtain appropriate forms to request leave under the FMLA, but the City apparently does not have a specific form for that purpose."  The letter concluded:

> Thus, I am notifying you that I am requesting leave provided either under the City's own policies or under the FMLA to care for both my father and my daughter.  My request is retroactive to August 24, 2006.  At this point, I cannot inform you when I will return, since my return depends upon how quickly my father and my daughter recover.  I do not anticipate requiring more than a total of 30 days leave.

The City contends that plaintiff was not entitled to FMLA leave at that time.  The City points out that plaintiff's daughter had been attending school since September 8, 2006.  Additionally, when plaintiff was asked in her deposition what assistance she was providing to her father as of September 11, 2006, she testified that she "went to his home on a regular basis and took care of whatever needed to be taken care of, lawn, whatever, I mean, whatever he needed to be done.  He has 11 acres and there is lots of work."

On or about September 14, 2006, Chief Beth sent a letter to plaintiff stating that the City is "to[o] small to be subject to FMLA."  He also noted in general terms deficiencies that Chief Beth had discovered during plaintiff's absence concerning her prior performance of

8

her job duties.  The letter stated: "For both reasons, I am recommending your termination to the City Council."  Plaintiff called Chief Beth as soon as she received the letter and told him she would make arrangements to return to work rather than lose her job.  Chief Beth told her not to bother coming in and that she would be "receiving a letter."

On or about September 25, 2006, the City Council voted to terminate plaintiff's employment.  The stated reasons for her termination were her failure to perform her job duties and her failure to return to work at the expiration of her leave.  Councilman Isenhour told his colleagues that he thought her termination was retaliatory.  He asked about her disciplinary record, and was told that she had no previous discipline.  Plaintiff was not given an opportunity to respond to the statements regarding her job performance and, as a result, the City Council received no information about her side of the events cited as supporting her termination.  The manner in which plaintiff was terminated was in direct contravention to the progressive disciplinary policy and grievance procedures set forth in the City's personnel manual.

The City contends that at the time of plaintiff's FMLA leave request in September of 2006, the City did not employ fifty employees.  According to an affidavit by Barbara Stafos, who is employed by the City as its treasurer, on September 12, 2006, the City had forty-five employees.  Plaintiff Harbour controverts this affidavit, contending that it fails to account for several employees who should have been included on the list attached to Ms. Stafos's affidavit.  The evidence concerning whether the number of City employees met the FMLA's fifty-employee threshold is controverted, and is discussed in more detail below.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671.

10

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

For the reasons explained below, the summary judgment record contains genuine issues of material fact sufficient for plaintiff to withstand summary judgment on her First Amendment retaliation claim. Additionally, the record contains genuine issues of material fact about whether plaintiff is an "eligible employee" under the FMLA, as determined by

11

whether the City employed less than fifty employees at the time she submitted her leave request. And, the record contains genuine issues of material fact sufficient for plaintiff to withstand summary judgment on her FMLA interference and retaliation claims. Accordingly, the court will deny defendants' motions for summary judgment.

**I.      § 1983 Claim for Violation of First Amendment Rights**

The court's analysis of freedom of speech retaliation claims is governed by a five-step inquiry referred to as the *Garcetti/Pickering* analysis. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007). First, the court must determine whether the plaintiff was speaking as a citizen or "'pursuant to [his or her] official duties.'" *Id.* (quoting *Garcetti*, 126 S. Ct. at 1960). "If the employee speaks pursuant to his or her official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" *Id.* (same). Second, if the employee does not speak pursuant to his or her official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. *Id.* If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. *Id.* at 1203. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Id.* (quotation omitted). Fourth, if the employee's interest outweighs that of the employer, the employee must show that his or her speech was a "substantial factor or a motivating factor in [a] detrimental employment decision." *Id.* (quotation omitted).

12

Finally, if the employee establishes that his or her speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Id.* (quotation omitted). The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact. *Id.*

Defendants contend that they are entitled to summary judgment based on the fourth stage of this analysis—that is, that plaintiff's involvement in the AG's investigation was not a substantial or motivating factor in the termination of her employment. To withstand summary judgment at this stage of the *Garcetti/Pickering* analysis, the employee must produce evidence linking the employer's action to the employee's speech. *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005). A plaintiff cannot meet his or her burden by merely showing that the elimination of the protected activity may have been welcomed by the employer. *Id.* at 1189. Evidence of causation may include evidence that the employer expressed opposition to the employee's speech or evidence that the speech implicated the employer in serious misconduct or wrongdoing. *Id.* Evidence such as a long delay between the employee's speech and the challenged conduct or evidence of intervening events tends to undermine an inference of retaliatory motive and weaken the causal link. *Id.*

In this case, notwithstanding the long delay between plaintiff's cooperation in the AG's investigation in March of 2006 and her termination approximately six months later in September of 2006, the summary judgment record contains sufficient evidence to create an inference that plaintiff's termination was in retaliation for her cooperation in the investigation. Viewing the evidence in the light most favorable to plaintiff, a rational trier

of fact could find that City Council members and Mr. Spangler did not want her to cooperate in the AG's investigation and, in particular, to say anything that would implicate them. Plaintiff Jeffrey Cheek was arguably the primary participant in the AG's investigation within the Edwardsville Police Department and the summary judgment record contains evidence that the City wanted him gone precisely because of his involvement in the investigation. The City first suspended then later terminated him in April and May of 2006. *See Coletti v. Cudd Pressure Control*, 165 F.3d 767, 776-77 (10th Cir. 1999) (testimony of other employees about their treatment by the defendant employer is relevant to the employer's discriminatory intent if the testimony establishes a pattern of retaliatory behavior). After Major Cheek was gone, the new Interim Chief Beth and Mr. Spangler met with Major Doty and Ms. Harbour to suggest to them that they needed to become a part of the "new organization," and Mr. Spangler railed about the AG's investigation. In late June of 2006, Chief Beth obtained emails that plaintiff Harbour had sent to Mr. Williams. In mid July, Ms. Harbour's job was cut from full time to part time, which caused her to lose health insurance. The investigation resulted in criminal charges being filed against former Chief of Police Vaughan and Councilman Lane on July 28, 2006. Three days later, Chief Beth placed Major Doty on an indefinite unpaid suspension. On August 2, Ms. Harbour was advised by her doctor to take two to four weeks off work due to stress. Then, she was terminated in a manner that did not comply with the City's progressive discipline and grievance policies. And, Major Doty was terminated on the same day. The termination of plaintiffs Harbour and Doty effectively rid the Edwardsville police department of the three employees who had had primary involvement

14

in the AG's investigation.  Certainly, a rational trier of fact could find based on these facts that plaintiff was terminated because of her involvement in the investigation.  Defendants' motion for summary judgment on this issue is without merit.

Defendants' claim that the individual defendants Kelly, Broman, and Burnett are entitled to qualified immunity is also without merit.  The Tenth Circuit has had "little difficulty" rejecting such a claim of qualified immunity.  *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1333 (10th Cir. 2007).  The court noted that "[i]t has been long established law in this circuit that when a public employee speaks as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so, the employer may not take retaliatory action."  *Id.* at 1333-34.  Defendants Kelly, Broman, and Burnett voted to terminate plaintiff's employment as well as the employment of Majors Cheek and Doty.  A rational trier of fact could infer based on the summary judgment record that they knew about these employees' involvement in the AG's investigation and knew that these employees' superiors were unhappy about it, yet they blindly relied on their superiors' recommendations for termination without conducting any type of meaningful inquiry into the legitimacy of those justifications for terminating long-time City employees.  Accordingly, defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim is denied.

## II.    FMLA Claims

Plaintiff Harbour asserts two FMLA claims: an interference claim and a retaliation claim.  To establish an interference claim, plaintiff must show that (1) she was entitled to

take FMLA leave, (2) some adverse action by the employer interfered with her right to take FMLA leave, and (3) the employer's action was related to the exercise or attempted exercise of her FMLA rights. *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). To make out a prima facie retaliation claim, plaintiff must show that (1) she engaged in a protected activity, (2) defendant took an action that a reasonable employee would have found materially adverse, and (3) there exists a causal connection between the protected activity and the adverse action. *Id.*

The City seeks summary judgment on plaintiff's FMLA claims on four grounds. First, the City argues that plaintiff Harbour is not an "eligible employee" entitled to leave under the FMLA because the City of Edwardsville did not have fifty employees at the time she requested leave. Second, the City argues that she did not give the City proper notice of her need for FMLA leave. Third, the City argues that she was not entitled to FMLA leave to care for a family member because (1) her daughter did not suffer from a serious health condition and (2) she did not provide the type of care to her father for which FMLA leave is designed. And, fourth, the City argues that she cannot establish the third element of an interference or retaliation claim.

A.   "Eligible Employee"

The FMLA requires covered employers to provide eligible employees with up to twelve weeks of unpaid, job-protected medical leave per year. *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 726 (10th Cir. 2006). Only those employees whose employer employs less than fifty employees within seventy-five miles of that employee's worksite are

eligible for leave under the Act.  *Id.*; 29 U.S.C. § 2611(2)(B)(ii).  If an employer does not employ at least fifty people within seventy-five miles of an employee's worksite, that employee is not an "eligible employee" for FMLA purposes.  *Hackworth*, 468 F.3d at 726 n.4.  The threshold question of whether a plaintiff qualifies as an eligible employee is not jurisdictional, but rather is an element of a plaintiff's claim for relief.  *Id.*

In the FMLA, Congress granted the Secretary of Labor the power to "prescribe such regulations as are necessary to carry out [the FMLA]."  29 U.S.C. § 2654.  Pursuant to this grant of authority, the Department of Labor (DOL) has promulgated a regulation which states that the number of people so employed is determined by "the number of employees maintained on the payroll."  29 C.F.R. § 825.111(c); *see Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 207 (1997) (noting with approval that the DOL has adopted the payroll method under the FMLA).  This test is "generally called the 'payroll method,' because the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll."  *Walters*, 519 U.S. at 206.  Whether an employee is an "eligible employee" for purposes of the fifty-employee threshold "is determined when the employee gives notice of the need for leave."  29 C.F.R. § 825.110(f).

The City's motion for partial summary judgment on plaintiff's FMLA claim is based on its assertion that it employed fewer than fifty employees at the time plaintiff submitted her FMLA leave request.  This argument is supported by an affidavit from Barbara Stafos, the City Treasurer.  Attached to Ms. Stafos's affidavit is a list of forty-five individuals who were employed by the City.  In subsequent briefing by the parties, the City conceded that Alvin

Doty should also have been included on this list, thus bringing the undisputed number of City employees to forty-six. Additionally, Ms. Stafos testified during her deposition that certain employees were paid once a month and would appear only on the payroll list for the first pay period of the month. These employees did not appear on the payroll upon which her original affidavit was based because it was a mid-month payroll. She identified a codes enforcement officer, a municipal court judge, and three persons on the city's cemetery board as employees who were paid once a month, and none of whom were listed on the list attached to her affidavit. Additionally, plaintiff was still on the payroll as of the date she submitted her FMLA leave request. Employees on unpaid leave "are counted [under the payroll method] as long as the employer has a reasonable expectation that the employee will later return to active employment." *Id.* § 825.105(c). A rational trier of fact could find that the City had a reasonable expectation that plaintiff would return to work. She had been employed with the City for six years; in Chief Beth's letter he stated that "we need to hear from you by September 12, 2006 as to when you can return to work"; and she expressly stated in her September 11, 2005, letter that she had "no intention of leaving [her] job." All total, then, for summary judgment purposes the record establishes that the City had fifty-two people on its payroll at the time plaintiff submitted her FMLA request.[2]

---

[2] Plaintiff also contends that other City personnel qualify as employees including the city attorney, a municipal court prosecutor, an animal control officer, the police chief, and private firms the City paid on an hourly basis for engineering. Plaintiff has not, however, submitted any evidence to establish that these personnel appeared on the City payroll as opposed to being paid in some other form such as by way of accounts payable.

The City nonetheless contends that the codes enforcement officer and cemetery board members fall under the FLSA's "personal staff" and "policymaking" exceptions and, therefore, should not be counted. The legal premise underlying the City's argument is a somewhat novel approach, and the court believes that it is a correct interpretation of the law. The FMLA states that the term "employee" has the same meaning given to that term in the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203(c), (e) & (g). 29 U.S.C. § 2611(3). Thus, only those employees who would qualify as employees under the FLSA's definition of "employee" would also qualify as employees under the FMLA. The FLSA includes within the definition of "employee" individuals who are employed by a political subdivision of a state, with certain exceptions. *Id.* § 203(e)(2)(C). Among those exceptions are the "personal staff" and "policymaking" exceptions. *Id.* § 203(e)(2)(C)(ii)(II) & (III). Thus, to the extent that certain employees would fall within these exceptions under the FLSA, they would also be excluded from being considered employees for FMLA purposes.

The problem with the City's argument based on the FLSA exceptions is that the City should have the burden of proving that these exceptions apply. Under the FLSA, an employer bears the burden of proving entitlement to any exemptions or exceptions. *See Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999); *see also Welding v. Bios Corp.*, 353 F.3d 1214, 1218 (10th Cir. 2004) (employer has burden of establishing exemption from FLSA overtime requirements affirmatively and clearly). Although a plaintiff generally bears the burden of proving that he or she is an "eligible employee" for purposes of the FMLA's fifty-employee threshold, the FMLA expressly incorporates the FLSA's

19

definition of "employee," thus implicitly incorporating the FLSA burdens of proof, as well. This, of course, is the most logical allocation of the burden given the employer's relative ease of access (as compared to the plaintiff employee's lack of available access) to information concerning the nature of its other employees' status. *See* 29 Am. Jur. 2d *Evidence* § 161, at 186 (1994) (explaining that "[w]here information necessary to prove an issue is peculiarly . . . within the possession of one party, . . . convenience and fairness justify placing the burdens of pleading and proving those facts upon that party"). Because the City bears the burden of proof on this issue, then, its initial summary judgment burden is not merely to point to the absence of a genuine issue of material fact. Rather, the City must show that "no disputed material fact" exists on this issue and, absent such a showing, plaintiff bears no summary judgment burden. *Cf. Johnson v. Riddle*, 443 F.3d 723, 724 n.1 (10th Cir. 2006) (clarifying summary judgment burden where a defendant is seeking summary judgment on the basis of an affirmative defense); *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) (same). The court has reviewed the record and does not believe that the City has met its affirmative burden of demonstrating no disputed material fact as to whether the disputed employees qualify for the FLSA's "personal staff" and "policymaking" exceptions so as to bring the number of City employees to less than fifty. Consequently, a genuine issue of material fact exists on the issue of whether plaintiff is an "eligible employee" who was entitled to leave under the FMLA.[3]

---

[3] The court rejects plaintiff's argument that she must be covered by the FMLA because the City, as a governmental entity, is not subject to the fifty-employee threshold. *See*

B.    Notice

The City contends that plaintiff Harbour did not give the City proper notice of her need for leave under the FMLA because she did not give notice to Chief Beth, who was her supervisor, and also because she submitted her request for leave so belatedly.  The FMLA regulations state that the "employer may waive employees' FMLA notice obligations."  29 C.F.R. § 825.304(a).  Here, in Chief Beth's letter to Ms. Harbour dated September 5, 2006, he stated that he understood that her father had been ill, was sorry to hear that, and understood how stressful that could be; and he stated that he needed to hear from her by September 12, 2006, as to when she could return from work.  Plaintiff responded to his letter by submitting an FMLA leave request.  A rational trier of fact could certainly find that this constituted a waiver by the City of any arguable deficiencies in her FMLA notice. Accordingly, the City is not entitled to summary judgment on this basis.

C.    Entitlement to FMLA Leave

Under the FMLA, an eligible employee is entitled to leave "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  The City contends that Ms. Harbour was not entitled to leave under the FMLA because her daughter's injuries did

_____

*Fain v. Wayne County Auditor's Office*, 388 F.3d 257, 258 (7th Cir. 2004) (explaining that even though a public agency is an "employer" under the statute regardless of the number of employees, the fifty-employee limit is resurrected in the definition of "eligible employee"); *see also* 29 C.F.R. § 825.108(d) (stating "employees of public agencies must meet all of the requirements of eligibility, including the requirement that the employer (*e.g.*, State) employed 50 employees at the worksite or within 75 miles").

not qualify as a "serious health condition" under the FMLA.  The term "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider."  *Id.* § 2611(B).  Under the DOL regulations, "continuing treatment by a health care provider" includes:

> A period of *incapacity* (*i.e.*, inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>     (A) Treatment two or more times by a health care provider . . . ; or
>     (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i) (italics in original).  The Tenth Circuit has interpreted this regulation to mean that a serious health condition involving continuing treatment by a health care provider includes a period of incapacity that also involves treatment two or more times by a health care provider, and any subsequent treatment or period of incapacity relating to the same condition.  *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1321 (10th Cir. 2005).

The summary judgment record reflects that Brittany Harbour was in a car accident on August 25, 2006, and suffered a closed head injury.  She was absent from school from August 28, 2006 (the Monday following the accident) through September 1, 2006.  The next Monday was Labor Day.  She attempted to return to school on Tuesday, September 5, 2006, but was unable to complete the school day.  She was absent again on September 6 and 7, 2006.  Thus, her period of incapacity ("inability to . . . attend school") began on the day of her accident and lasted through September 7, 2006.  During that time period she was treated

two or more times by a health care provider.  She was treated at the Overland Park Regional Medical Center emergency room immediately following the accident.  She saw Dr. Weatherford on August 30, 2006, and he referred her to Lawrence Memorial Hospital for a CT scan the same day because she had "persistent . . . headache" following a "closed head injury."  Both the emergency room visit as well as the subsequent office visit and CT scan qualified as "treatment," which is defined to include "examinations to determine if a serious health condition exists and evaluations of the condition."   29 C.F.R. § 825.114(b). Consequently, the summary judgment record reflects that Brittany Harbour suffered from a "serious health condition" from August 25, 2006, through September 7, 2006, such that her mother was entitled to FMLA leave to care for her.

The City does not contend that plaintiff's father, who had open heart surgery on August 23, 2007, did not suffer from a serious health condition.  Instead, the City points to deposition testimony by Ms. Harbour that she was taking care of her father's eleven-acre lawn, and argues that is not the type of "care" for her father for which leave is required under the FMLA.  The regulations explain that the phrase "to care for" a family member

> encompasses both physical and psychological care.  It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care.

29 C.F.R. § 825.116(a).  Additionally, it "includes situations where the employee may be needed to fill in for others who are caring for the family member."  *Id.* § 825.116(b).

Viewing the summary judgment record in the light most favorable to Ms. Harbour, it contains evidence from which a rational trier of fact could find that she was needed "to care for" her father within the meaning of the regulations.  He had just had open heart surgery. She went to his house and "took care of whatever needed to be taken care of . . . whatever he needed to be done."  Additionally, her mother sometimes was not present when she was at her father's house, thus suggesting that she was "needed to fill in" on taking care of her father while her mother left the home.  Accordingly, the City is not entitled to summary judgment based on the absence of a genuine issue of material fact concerning whether plaintiff was entitled to leave under the FMLA.

D.    Causal Connection[4]

Lastly, the City argues that there was no causal connection between plaintiff's protected activity and her termination because sufficient independent grounds existed supporting her termination even in the absence of her FMLA leave.  The City points to the lapse of time between the expiration of her initial FMLA leave due to stress and the point in time when she finally submitted her request for additional leave.  Additionally, during the time period when she was off work, Chief Beth found evidence that she had not been performing her job duties.  While that is certainly one view of the evidence, at this procedural juncture the court must of course view the summary judgment record in the light most

---

[4] The "causal connection" element applies to plaintiff's FMLA retaliation claim, but not her interference claim.  *Campbell*, 478 F.3d at 1287 (setting forth the elements of both types of claims).  Once the plaintiff has shown that FMLA leave was interfered with, the employer bears the burden of proof on the third element of an interference claim.  *Id.*

favorable to plaintiff.  Viewed as such, a rational trier of fact could find that Ms. Harbour's

FMLA leave caused her termination.  She was terminated within days after her entitlement

to leave expired.  *See Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1228 (10th

Cir. 2006) (protected activity that is followed very close in time by retaliatory conduct,

standing alone, is sufficient to justify an inference of retaliatory motive).  As if that were not

enough, in Chief Beth's letter terminating plaintiff he expressly stated that her absence

imposed a hardship on the department and he pointed out that she had been off work for six

weeks.  A rational trier of fact could certainly infer from this evidence that she was

terminated precisely because of her FMLA leave.  Accordingly, defendants' motion for

summary judgment on plaintiff's FMLA retaliation claim is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for

Partial Summary Judgment and defendant's Motion for Summary Judgment (docs. #15 &

#47 in Case No. 06-2459) are denied.

**IT IS FURTHER ORDERED** that this case is set for trial beginning at **10:30 a.m.**

**on October 16, 2007**.

**IT IS SO ORDERED** this 6th day of September, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge